FILED

2026 Mar-25 PM 02:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| MARINE MANAGEMENT SERVICES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 2:23-cv-00632-AMM |
| ARCHIE LEE SLATER, | ) ) | (LEAD) |
| Defendant. | ) ) | |

| | | |
|---|---|---|
| ARCHIE LEE SLATER, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| | ) | Case No.: 2:23-cv-01604-AMM |
| MARINE MANAGEMENT SERVICES, INC. and SHELL OFFSHORE, INC., | ) ) ) | (CONSOLIDATED) |
| | ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case comes before the court on a Motion for Partial Summary Judgment filed by Marine Management Services, Inc. ("MMSI"), Docs. 66–67, and a Motion for Partial Summary Judgment by Archie Lee Slater, Docs. 65, 68, 69. The motions are fully briefed. Docs. 73, 75, 78, 79, 81, 82, 83. For the reasons stated below, the court **GRANTS IN PART** and **DENIES IN PART** MMSI's motion and **GRANTS IN PART** and **DENIES IN PART** Mr. Slater's motion.

## I. BACKGROUND

Mr. Slater was hired by MMSI in 2019 to work as a marine foreman. Doc. 66-1 at 13; Doc. 66-3 at 2–10. He worked for MMSI until 2022. Doc. 66-1 at 14. Throughout his time at MMSI, Mr. Slater signed several Crewmember Employment Agreements—including agreements on December 9, 2019, April 21, 2020, and December 10, 2021—each setting his employment terms for the duration of the relevant agreement. *See id.*; Doc. 81 ¶ 5; Doc. 75-1 ¶ 6; Doc. 65-1 at 134–56. The December 10, 2021, agreement was in place at the time of the incident giving rise to this suit. Doc. 66-1 at 15.

As a condition of Mr. Slater's employment, Mr. Slater had to provide MMSI a valid United States Coast Guard medical certificate, which is required for any position working at sea. *Id.* at 11; Doc. 75-1 ¶ 8. Mr. Slater applied for and received Coast Guard medical certificates several times over the years, including in 2018, 2020, and 2022. Doc. 66-9 at 13; Doc. 66-2 at 31–33; Doc. 66-1 at 9. Each medical certificate is valid for a period of two years. Doc. 66-9 at 13; Doc. 66-2 at 31–33; Doc. 66-1 at 9. Each time the Coast Guard issued the medical certificate, the certificate stated that Mr. Slater was "free from any medical condition likely to be aggravated by service at sea or to render [Mr. Slater] unfit for such service or to endanger the health of other persons on board." Doc. 66-2 at 31–33. To obtain the medical certificate, Mr. Slater had to submit a written application and be examined

by a physician, physician assistant, or nurse practitioner. *See, e.g.*, Doc. 66-9 at 13; Doc. 66-4 at 14–25; Doc. 66-7 at 13–22.

The application requires that applicants "report their relevant medical conditions to the best of their knowledge." *See, e.g.*, Doc. 66-4 at 15. "Applicants should check YES if: 1) they have had a previous diagnosis, or treatment for the condition by a health care provider; 2) they are currently under treatment or observation for the condition; or 3) the condition is present, regardless of treatment status." *See, e.g.*, *id.* "The Medical Practitioner must review and discuss all conditions reported by the applicant . . . ." *See, e.g.*, *id.* "If the Medical Practitioner discovers a condition not reported by the applicant, they must check YES in the appropriate block [on the application] and provide information on the condition, as requested [on the application]." *See, e.g.*, *id.*

The application lists thirty-four conditions, with corresponding boxes for the applicant to mark "YES," "NO," "PR," or "MW." *See, e.g.*, *id.* at 18. "PR" refers to a condition that has been previously reported, and "MW" refers to a condition for which the applicant has a medical waiver. *See, e.g.*, *id.* On Mr. Slater's 2020 application—the one in effect at the time of the incident—Mr. Slater checked "NO" for every one of the thirty-four listed conditions. *Id.* Among these conditions, the application lists "Back, neck or joint problems that impair movement or cause

3

debitating pain," and "Any diseases, surgeries, cancers, illnesses, or disabilities not listed on this form." *Id.*

But Mr. Slater suffered from chronic back problems for more than a decade prior to his 2020 application. *See* Doc. 66-1 at 16. In the early 2000s, Mr. Slater suffered a back injury while working at sea for a previous employer and had surgery on his "L2 disc" as a result. *Id.* at 8, 12. Then, in 2009, Mr. Slater had surgery to remediate another back injury sustained at sea while working for a different employer—this time a "spinal discectomy on 2 and 3, the bulging disc." *Id.* at 12; Doc 66-4 at 5. The 2009 surgery was on his L2-L3 vertebrae. Doc. 66-1 at 18; Doc. 66-4 at 5. According to Mr. Slater, the two surgeries in the early 2000s were "the same procedure." Doc. 66-1 at 18. Mr. Slater also had previous surgeries on at the L4-L5 level and the L5-S1 level, along with what Mr. Slater's doctors described in 2022 as recurrent disc herniation at the L4-L5 and L5-S1 levels. Doc. 66-11 at 24.

In his briefing, Mr. Slater disputes the continuous nature of his back problems throughout the years. *See* Doc. 79 at 6 ("Disputed. [Mr.] Slater has prior back injuries and surgeries; there is no evidence of a continuous history of 'back problems for 20 years,' i.e., that the back problems were present throughout the 20-year period referenced."). But in his deposition, Mr. Slater was asked, "[I]s that true that you have had back problems for more than 20 years?" to which Mr. Slater responded, "Yes, yes. I have since 2002." Doc. 66-1 at 16. Shortly after that, Mr. Slater

attempted to clarify that "[i]n 2009, [he] didn't have any back pain" prior to his surgery. *Id.* But Mr. Slater admitted that from 2009 until 2020, he received and took pain pills from various sources—including his dentist and his mother—to ease his chronic back pain. *Id.* at 23. Mr. Slater admitted, and his medical records confirm, that in November 2020, he visited Alabama Pain Specialists and reported chronic low back pain that "began approximately 12 years ago, but worsened over the last six months." *Id.* at 22; Doc. 66-5 at 3. He complained that the "pain is always present with varying intensity." Doc. 66-1 at 23; Doc. 66-5 at 3. In other of his medical records, his chronic back pain is listed with a June 8, 2021, start date. Doc. 66-6 at 6–7 (records from doctor visit on June 8, 2021).

Mr. Slater claims that the June 8, 2021, onset date for his back pain is "in question" because in the notes from Mr. Slater's June 8, 2021, doctor's visit, under "Chief Complaint," there is no mention of back pain. Doc. 79 at 7–8. And in the June 8, 2021, records, Mr. Slater's doctor noted a June 4, 2021, onset date of hypertensive disorder and obesity, Doc. 66-6 at 7, though those conditions are listed in Mr. Slater's medical records from a March 9, 2021, visit, Doc. 73-3 at 3–4. Further, Mr. Slater argues that the date could not be correct because on his March 2021 and December 2021 visits, he reported a "0" as his rating on the pain scale. *Id.* at 2; Doc. 66-6 at 14. Regardless of whether the June 8, 2021, onset date is precisely correct, Mr. Slater's medical records—and his own testimony—show that Mr. Slater

5

suffered from at least intermittent chronic back pain throughout several decades. And the record shows that Mr. Slater was not entirely honest with his healthcare providers at these visits. *See, e.g.*, Doc. 66-6 at 23 (omitting any mention of previous surgeries from his records at his December 2021 visit).

The precise contours of Mr. Slater's decades-long pain management remain uncertain. Mr. Slater alleged that from 2009 to 2020, he did not have any medical treatment or any family doctor, but he also stated that around 2014 or 2015 he started seeing Dr. Yu and received medical treatment. Doc. 66-1 at 20. But later in his deposition, Mr. Slater indicates that "Dr. Davis was [his] primary doctor first before Dr. Yu," *id.* at 23, and that in 2009 he was treated by Dr. Michael Kohrman for continuing pain after his 2009 surgery, *id.* at 18; *see also* Doc. 66-4 at 6 (showing that Mr. Slater received treatment for continued back pain in late 2009 after his 2009 back surgery). Without resolving the nuanced factual disputes about specific dates or continuity of pain and treatment, the record clearly shows that Mr. Slater had previously received treatment by a healthcare provider for back injuries and back pain, thus falling within the application's reporting requirement. *See* Doc. 66-4 at 15 ("Applicants should check YES if . . . they have had a previous diagnosis, or treatment for the condition by a health care provider . . . .").

On February 25, 2022, while working at sea on a vessel called TURRITELLA, Mr. Slater sustained an injury. Doc. 66-1 at 47–49. Mr. Slater and some of his

colleagues were "going to do an exercise" in a fast rescue craft while the TURRITELLA was several hundred miles offshore. *Id.* at 47. While aboard the fast rescue craft, the engine failed. *Id.* According to Mr. Slater, "[they] [we]re adrift, getting slung around by the seas" because "[they] had some nice swells that day." *Id.* at 48. Mr. Slater explained that "[his] footing was all over the place, and getting bounced, and thrown around against the railing, and stuff like that." *Id.* at 49. And "at [some] point in the operation" Mr. Slater pulled something in his groin area. *Id.*

According to Mr. Slater, the proper procedure to recover the fast rescue craft was to lower Lifeboat #4. *Id.* Instead, the crew used another boat, the HARVEY STONE, to attempt rescue, but according to Mr. Slater, "the seas were too rough." *Id.* "So every time [the fast rescue craft] got close to them under the stern, the boat kept knocking up to their hull." *Id.* "So [the crew] ended up rigging something up over down on [the fast rescue craft] side, the TURRITELLA side, and used the mooring winch to bring [the fast rescue craft] in instead of the men trying to pull [the craft] in because the current was too strong." *Id.*

According to Mr. Slater, "[o]ne of the reasons" Lifeboat 4 was not deployed was because it did not have sufficient manpower. *Id.* at 50. Mr. Slater was assigned to be the Lifeboat #4 helmsman, but he could not help man Lifeboat #4 because he was on the fast rescue craft. *Id.* According to Mr. Slater, "[t]hey have had plenty – a lot of issues with [the fast rescue craft], a lot," including an incident where the engine

failed after they launched the fast rescue craft, but he could not recall exactly when those incidents happened. *Id.*

Captain Claudiu C. Iordache, Mr. Slater's supervisor at the time of the incident, disagrees with Mr. Slater's description of the events. *See* Doc. 75-2 at 2–4. Captain Iordache "was the supervisor for and personally observed the Fast Rescue Craft . . . launch and retrieval during which Mr. Slater claims he was injured." *Id.* ¶ 5. "Between February 6, 2022, when the [fast rescue craft] engine was last repaired for running issues, and the February 25, 2022 launch, there were no known issues with the [fast rescue craft] engine running improperly." *Id.* ¶ 6. And "prior to launching the [fast rescue craft] on February 25, 2022, the [fast rescue craft] crew ran the engine to ensure it was working properly. The engine ran properly, and no issues were discovered during the pre-launch engine test." *Id.* ¶ 7. "Regarding retrieval of the [fast rescue craft] in the event of engine failure, standard procedure is that the standby boat can be an offshore supply vessel . . . or Lifeboat #4 on Turritella." *Id.* ¶ 8. "Standard procedure is to first rely on an [offshore supply vessel] for retrieval if one is available, which is the quickest and safest option for retrieval because the [offshore supply vessel] is already in the water and there is no need to launch a lifeboat." *Id.* "If an [offshore supply vehicle] is not available, then Lifeboat #4 would be launched to retrieve the disabled [fast rescue craft]." *Id.* "This procedure was based on consideration of the risks involved with retrieving a disabled [fast

rescue craft].” *Id.* And, according to Captain Iordache, “although the [fast rescue craft] was adrift, [he] disagree[s] that the [fast rescue craft] was ‘getting slung around by the seas.’” *Id.* ¶ 9. Captain Iordache maintains that using the HARVEY STONE rather than Lifeboat #4 was “standard procedure.” *Id.* ¶ 10. Contrary to Mr. Slater’s claim that using the HARVEY STONE ran contrary to the agreed-upon plan, “[u]sing the [offshore supply vessel] was planned and did, in fact, result in the retrieval of the [fast rescue craft].” *Id.* ¶ 11.

Mr. Slater did not feel his pulled groin “until the next morning [after the incident] . . . when [he] tried to get up and [he] couldn’t move.” Doc. 66-1 at 49–50. So he went to the medic. *Id.* at 50. On February 28, 2022, Mr. Slater submitted a “Report of Illness/Injury.” Doc. 66-11 at 30. Under “Description of Illness or Injury,” Mr. Slater wrote, “strained or pulled muscle in groin area.” *Id.* And in the box provided to indicate which “part of body” was injured, Mr. Slater did not check the box marked “Back,” but rather marked the box for “Trunk (except back).” *Id.*

Shortly after the injury, Mr. Slater left the TURRITELLA. Doc. 66-1 at 29. Mr. Slater went to Terrebonne General Hospital, seeking treatment for self-described groin pain. *Id.* at 30. Mr. Slater was given medication and discharged with instructions to go see his physician. *Id.*

Eight days later, Mr. Slater went to Complete Family Health Care, where he reported chronic back pain since 2021 and complained of groin pain. *Id.* at 31. At

his healthcare provider's instructions, he returned a few weeks later. *Id.* At his second visit, almost exactly a month after his injury, Mr. Slater was cleared to return to work without restrictions. *Id.*

He returned to work on the TURRITELLA on April 8, 2022. *Id.* at 34. He worked his "full hitch 29 days." *Id.* During that time he did not report any back problems to MMSI. *Id.* On June 3, 2022, he worked another "full hitch 27 days" on the TURRITELLA. *Id.* From the date of his injury—February 25, 2022—until the last day he worked for MMSI, he never complained of back pain to anyone at MMSI. *Id.*

Mr. Slater's treating physicians have described Mr. Slater's injury as a "posterior herniation" of the L2-L3 vertebrae. Doc. 66-11 at 6. Another of his physicians described a "fairly severe generalized central canal compromise" in the L2-L3 vertebrae. *Id.* at 24. The reports describe degeneration in other parts of Mr. Slater's back. *See id.* at 10. The reports consistently describe a "large herniation" on the L2-L3 vertebrae. *Id.* But one of Mr. Slater's doctors reports that Mr. Slater "has 3 large herniations at L2-3, L4-5 and L5-S1." *Id.* at 16. The doctor states that "[t]hese are even bigger than large I would state they are very large." *Id.* He goes on to state that "it is difficult to establish which or all of them causing [sic] the lower extremity numbness," but he "believe[s] the left hip flexion weakness would be from an L2-3 level but the abnormality is more on the right side on MRI." *Id.* Another physician

describes spondylolisthesis at the L3-L4 level. *Id.* at 23. That physician also reports disc protrusion at the L1-L2 and L3-L4 levels and disc herniation at the L4-L5 and L5-S1 levels. *Id.* at 24.

MMSI filed an action seeking a declaration about its duties to Mr. Slater, asking the court to rule that Mr. Slater's misrepresentations regarding his back condition bar his claims for maintenance and cure and diminish any recovery he may have. Doc. 1. Mr. Slater filed counterclaims—along with a separate suit of his own, 2:23-cv-01604-AMM—alleging that MMSI was negligent under the Jones Act and under general maritime law in maintaining the fast rescue craft and handling the February 25 incident and alleging that the TURRITELLA and fast rescue craft were unseaworthy. Doc. 40 at 10–15. Mr. Slater's claims are based in part on "possible ruptured and/or herniated discs." *Id.* at 13–14. Mr. Slater stipulated to dismissal of his claims and counterclaims as to any past payments for maintenance and cure. Doc. 64. The court consolidated MMSI's action and Mr. Slater's action. Doc. 25.

MMSI and Mr. Slater both filed motions for partial summary judgment. Docs. 65–69. MMSI seeks summary judgment on its claim that Mr. Slater was contributorily negligent and on its claim that it owes him no maintenance and cure due to his misrepresentations. Doc. 67 at 1–2. Mr. Slater seeks judgment in his favor on his negligence claims and claims for unseaworthiness. Doc. 68 at 1–2. He also

seeks a ruling that his maintenance and cure claim is not barred by any alleged misrepresentations. *Id.* at 2.

## II. LEGAL STANDARD

A party moving for summary judgment must establish "that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus*, *LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (cleaned up). A material fact is in "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (cleaned up).

"The movant's initial burden consists of a responsibility to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (cleaned up). "The nature of this responsibility varies, however, depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant would bear the burden of proof at trial." *Id.* If the movant bears the burden of proof at trial, the movant's initial burden is to "show affirmatively" that for each

element of its case, no reasonable factfinder could find in the nonmovant's favor. *Id.* (emphasis omitted).

If the nonmovant bears the burden of proof at trial, the movant's initial burden is not to "negate[]" an element of the nonmovant's case through, for example, an affidavit. *Id.* Instead, the movant can satisfy its initial burden by "showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (cleaned up). To do this, the movant "must point to specific portions of the record in order to demonstrate that the nonmoving party cannot meet its burden of proof at trial." *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 n.19 (11th Cir. 1991) (en banc). For example, the movant may point to the nonmovant's response to an interrogatory and note that the response fails to identify a basis of proof for an essential element of the nonmovant's case. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 607 (11th Cir. 1991). "[I]t is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id.* at 608.

If the moving party has carried its initial burden, Rule 56 requires the nonmoving party "go beyond the pleadings" and establish that there is a material fact in genuine dispute. *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c)(1)(A).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (cleaned up).

## III. ANALYSIS

### A. Maintenance and Cure and the *McCorpen* Defense

Seamen have a right to maintenance and cure for injuries that they suffer in the course of employment while on a vessel, regardless of whether the shipowner was at fault or the vessel was unseaworthy. *See O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 41–43 (1943); *Kasprik v. United States*, 87 F.3d 462, 464 (11th Cir. 1996); *Flores v. Carnival Cruise Lines*, 47 F.3d 1120, 1124 (11th Cir. 1995). "Maintenance" is the right of a seamen to food and lodging if he gets injured while fulfilling his duties to the vessel. *See Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 407–08 (2009). "Cure" is the right to necessary medical services. *See id.*

A seaman may be entitled to maintenance "even where the seaman has suffered from an illness pre-existing his employment." *McCorpen v. Cent. Gulf S.S.*

*Corp.*, 396 F.2d 547, 548 (5th Cir. 1968).[1] But the "general principle" is that "it will be denied where he knowingly or fraudulently conceals his illness from the shipowner." *Id.*

"In cases involving a pre-existing illness or other disability, the courts have made a distinction between nondisclosure and concealment." *Id.* "Where the shipowner does not require a pre-employment medical examination or interview, the rule is that a seaman must disclose a past illness or injury only when in his own opinion the shipowner would consider it a matter of importance." *Id.* at 548–49. "If the shipowner is unable to persuade the court or jury that the seaman could reasonably be expected to have considered his medical history a matter of importance, he will be liable for maintenance." *Id.* at 549. "He will be liable if it is found that there existed reasonable grounds for the seaman's good-faith belief that he was fit for duty." *Id.*

"On the other hand, where the shipowner requires a seaman to submit to a pre-hiring medical examination or interview and the seaman intentionally misrepresents or conceals material medical facts, the disclosure of which is plainly desired, then he is not entitled to an award of maintenance and cure." *Id.* at 549 (collecting cases).

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

But the defense "will not prevail unless there is a causal link between the pre-existing disability that was concealed and the disability incurred during the voyage." *Id.*

For an employer to establish the so-called *McCorpen* defense, the employer must show that: (1) the seaman "intentionally misrepresented or concealed medical facts; (2) the non-disclosed facts were material to" the employer's hiring decision; and "(3) a connection exists between the withheld information and the injury complained of in [the present] lawsuit." *Jackson v. NCL Am., LLC*, 730 F. App'x 786, 789 (11th Cir. 2018); *see also Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 171 (5th Cir. 2005) (citing *McCorpen* and laying out the numbered factors of the test).

### 1. The Coast Guard medical certificate application counts as a prehiring medical examination.

As an initial matter, Mr. Slater argues that the application for the Coast Guard medical certificate does not count as a "pre-hiring medical examination" that MMSI required as part of its onboarding process. He contends that MMSI never required him to submit to any pre-employment physical or medical examination. Doc. 69 at 33. According to Mr. Slater, during his employment with MMSI, the only physical examinations he had were ones conducted by the Coast Guard in the medical certificate process, which he underwent to maintain his Coast Guard license and not at MMSI's request. Doc. 73-1 ¶ 6. Mr. Slater believes that these Coast Guard physical examinations do not suffice as a pre-employment physical required by

MMSI. Doc. 69 at 27. So, Mr. Slater argues, the standard should be whether Mr. Slater had a good faith belief that he was fit for duty, which Mr. Slater contends he had. *See id.* at 33–36.

Mr. Slater makes two arguments for why his Coast Guard medical certificate application does not count as a pre-hiring physical examination for *McCorpen* defense purposes. *First*, Mr. Slater contends that "[t]he undisputed facts" show that he began working for MMSI aboard the TURRITELLA on January 13, 2019, so his 2020 and 2022 applications could not possibly count as a "pre-employment physical," since they were done after his hire in 2019. *Id.* at 27. *Second*, Mr. Slater argues that the applications were "done outside of the auspices of anything remotely related to a 'pre-employment' physical for MMSI or, for that matter, anything to do with MMSI other than the fact that a Coast Guard license was required for work aboard the TURRITELLA." *Id.* at 28–29.

As to the first argument, although Mr. Slater did begin work with MMSI and the TURRITELLA in January 2019, "Mr. Slater was not simply hired once in 2019. He was hired on multiple occasions to work different periods of time and subject to different employment agreements." Doc. 75-1 ¶ 10. This is reflected in the various Crewmember Employment Agreements that Mr. Slater signed. *See, e.g.*, Doc. 66-3 at 4–26. On February 25, 2022—the day of the fast rescue craft incident—"[Mr. Slater] had been hired in December 2021 under the terms of the December 10, 2021

17

Crewmember Agreement." Doc. 75-1 ¶ 10. Accordingly, Mr. Slater's 2020 Coast Guard medical certificate application and the attendant physical exam were done before Mr. Slater was hired under the employment agreement operative at the time of the incident.

According to Mr. Slater, MMSI's argument that it hired Mr. Slater on multiple occasions is "akin to a sham affidavit submitted in support of a summary judgment motion." Doc. 82 at 6. This is because "MMSI set forth as an ***undisputed fact*** that [Mr.] Slater was hired by MMSI in December of 2019." *Id.* (cleaned up). And "MMSI represented to the U.S. Coast Guard that [Mr.] Slater was hired on January 13, 2019 and worked until October 31, 2022." *Id.* "There is no mention of the fact that he was hired, and then re-hired, and then re-hired again." *Id.* And finally, "following his examination in July of 2020 and prior to his alleged re-hiring . . . in 2021, [Mr.] Slater worked aboard the TURRITELLA for nine different hitches between August of 2020 and November of 2021, for a total of 267 days." *Id.* So Mr. Slater claims that the court should reject as sham MMSI's claim that it rehired Mr. Slater in 2021 because "MMSI should not be allowed to assert one thing in another pleading and then, having been caught with its pants down, assert a completely different thing in another pleading." *Id.* at 7 (cleaned up).

MMSI's claims are not a "sham," and it has not been "caught with its pants down." MMSI never disputed or denied that Mr. Slater began working for MMSI in

2019. *See* Doc. 67 ¶ 1. Kyle A. Reneau, the Operations Manager in charge of "hiring, onboarding, assigning, training, and related employment duties for employees of [MMSI]," admitted that "[Mr.] Slater had been hired in the past, as early as 2019." Doc. 75-1 ¶¶ 1, 6; Doc. 66-10 ¶ 1. But MMSI hired Mr. Slater "on multiple occasions for different employment terms or periods." Doc. 75-1 ¶ 6. Mr. Slater acknowledged this in his deposition. Doc. 66-1 at 14 ("[Y]ou signed a specific Crewmember Employment Agreement to work for [MMSI], correct?" "Yes." "And you signed a number of them over the years, correct?" "Yes."). The 2021 Crewmember Agreement lists a "State Date" of January 1, 2022. Doc. 66-3 at 19. MMSI's contentions are entirely consistent with the record that Mr. Slater did begin work in 2019, but he subsequently executed several employment agreements with independent terms of employment.

In any event, even if the court were to look to January 2019 as Mr. Slater's employment start date, Mr. Slater submitted a Coast Guard medical certificate application in 2018, prior to his initial hire date. *See* Doc. 75-4. In his 2018 application—as in his 2020 and 2022 applications—Mr. Slater untruthfully denied having any back pain, joint problems, or orthopedic surgery. *See id.* at 2.

As to the second argument, the Coast Guard medical certificate application is not wholly "outside the auspices" of anything related to MMSI. Mr. Reneau testified that MMSI requires a valid Coast Guard medical certificate for seamen working on

the TURRITELLA, and such certificate "is a condition of employment as a seaman with MMSI." Doc. 66-10 ¶ 5. Mr. Reneau explained that he was personally involved with Mr. Slater's hiring and assignment to the TURRITELLA before the February 25, 2022, incident. *Id.* ¶¶ 1, 3. According to Mr. Reneau, MMSI "relies on the accuracy" of the seamen's Coast Guard medical certificates before it sends workers to MMSI vessels and before it hires them to work as MMSI seamen. *Id.* ¶ 14. "Without a valid [Coast Guard] Medical Certificate, MMSI would not have hired Mr. Slater to work on the FPSO TURRITELLA or any other ship." *Id.* ¶ 16.

Mr. Slater disputes that Mr. Reneau's statements are valid evidence that MMSI required a Coast Guard medical certificate when it hired Mr. Slater. *See* Doc. 79 at 3–4. Mr. Slater disputes that Mr. Reneau could have been involved with hiring Mr. Slater in 2019 because Mr. Reneau's LinkedIn profile indicates that at that time, he was a Regulatory Training Manager, rather than Operations Manager. *Id.* at 4 (referring to Doc. 73-2). Mr. Slater points out that Mr. Reneau "does not state that he was personally involved in hiring Slater in January of 2019." *Id.* And even if Mr. Reneau had stated such personal involvement, Mr. Slater disbelieves that Mr. Reneau was employed in a position involving hiring duties in January 2019. *See id.*

Assuming arguendo that Mr. Slater's arguments are true, they are irrelevant to dispute Mr. Reneau's testimony for two reasons. *First*, by the time Mr. Slater was hired and signed his Crewmember Employment Agreement on December 10, 2021,

Doc. 66-3 at 18, Mr. Reneau was an Operations Manager, and the LinkedIn page reflects this. Doc. 73-2. So even if Mr. Reneau were not involved in the 2019 hire, nothing in the record disputes his testimony that he was involved in the 2021 hiring decision relevant to this case. Mr. Slater contends that this testimony is rebutted by the MMSI employee signature on Mr. Slater's Crewmember Agreements—Lisa Haynie. *See* Doc. 79 at 4. But that signature does not establish that Mr. Reneau was not involved in Mr. Slater's hiring, though he may not have been the one to sign the agreement. *Second*, even if Mr. Reneau were not personally involved in Mr. Slater's 2019 hiring, it is undisputed that Mr. Reneau is presently in charge of all "hiring, onboarding, assigning, training, and related employment duties for employees of [MMSI]," and "[i]n [this] position, [Mr. Reneau] [is] familiar with the credentials . . . that are required for seamen, such as Mr. Slater, to work [for MMSI]." Doc. 66-10 ¶¶ 1, 2. Mr. Slater has given the court no reason or evidence to believe that MMSI's hiring requirements in 2019 were any different than MMSI's requirements in 2021 when Mr. Slater signed his last Crewmember Agreement.

Accordingly, Mr. Reneau's testimony establishes that MMSI has a practice of requiring seamen like Mr. Slater to undergo the Coast Guard medical certification process before they may be hired by MMSI. Indeed, Mr. Slater's own testimony supports this: he confirmed that "[y]ou need to have a medical certificate to be able

21

to work on the TURRITELLA" and it "is a condition of . . . employment." Doc. 66-1 at 11.

Mr. Slater's next argument is that even if the Coast Guard medical certificate is a requirement of MMSI employment, he never lied directly to MMSI, only the Coast Guard. *See* Doc. 69 at 28–30.

MMSI responds that "[Mr. Slater] cites no authority limiting *McCorpen* as narrowly as he does and offers no justifications for this Court being the first one to do so." Doc. 78 at 12. MMSI also argues that "[t]here is nothing equitable about allowing a seaman to recover maintenance and cure despite his conceded dishonesty, simply because an employer chose to rely on the pre-hiring medical examination by the Coast Guard instead of on a private one." *Id.* "[Mr.] Slater was just as dishonest, either way." *Id.*

Mr. Slater responds that "given that the *McCorpen* defense is MMSI's burden to prove, MMSI cites no case law which expands *McCorpen* as broadly as it does, i.e., that exams conducted years before hiring can be considered 'pre-employment exams.'" Doc. 82 at 8. "Instead, *McCorpen* is narrowly tailored to the period immediately before and after a person is hired – 'the hiring process' – and the exam must be something an employer requires of the applicant during the hiring process, not at some point far removed from the application, exam, and hiring." *Id.* at 9.

The Eleventh Circuit has never held that the *McCorpen* defense applies to only private examinations. The only Eleventh Circuit case to discuss the contours of the *McCorpen* defense lists three elements of the defense: (1) "[the seaman] intentionally misrepresented or concealed medical facts; (2) the non-disclosed facts were material to its decision to hire [him]; and (3) a connection exists between the withheld information and the injury complained of in th[e current] lawsuit." *Jackson*, 730 F. App'x at 789.[2] There is no mention of a required private exam or questionnaire, nor a pre-employment exam at all. Nothing in the elements of the defense excludes the situation here—an employer relying on a public medical examination that contained falsities.

Old Fifth Circuit precedent—the origin of the *McCorpen* defense—similarly provides no such exclusion. In the case establishing the defense, the Fifth Circuit described a pre-employment medical examination in which information about prior illnesses is solicited. *See McCorpen*, 396 F.2d at 549. In *McCorpen*, the defendant underwent a physical examination by the United States Public Health Service and a pre-employment physical examination for his employer. *Id.* at 548. The *McCorpen* court mentioned that the defendant had undergone both examinations but did not

---

[2] The Eleventh Circuit affirmed an application of the *McCorpen* defense in another case but did not discuss its contours. *See Witbart v. Mandara Spa (Haw.), LLC*, 860 F. App'x 175, 176 (11th Cir. 2021).

discuss the relative weight of either examination, nor did it exclude from the court's analysis the public examination. *See id.*

Consistently through the Fifth Circuit's application of the *McCorpen* defense, the court has not limited the defense to only particular medical examinations. Rather, the court focuses on the misrepresentation, its materiality, and the causal connection, not on the public/private nature of the test in which the misrepresentation was made. *See, e.g.*, *Brown*, 410 F.3d 166; *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296 (5th Cir. 2008).

Accordingly, a district court in Louisiana applied the *McCorpen* defense to a situation where the seaman lied about back injuries on the employer's questionnaire and "a United States Coast Guard Merchant Mariner Credential Medical Evaluation Report." *Smith v. Diamond Servs. Corp.*, 133 F. Supp. 3d 846, 848–50 (E.D. La. 2015). The court concluded that the seaman intentionally concealed his previous back injuries because he "was **twice** asked whether he had experienced prior back/neck pain or injury before he was hired by Defendant, and he failed to mention the aforementioned injuries." *Id.* at 850 (emphasis added). In so concluding, the court considered the seaman's lies on the pre-employment questionnaire and the Coast Guard medical certificate application. *See id.* at 849–50.

Further, the Fifth Circuit has allowed an employer to prevail on the *McCorpen* defense where it relied on a pre-employment questionnaire administered by its

predecessor. *See Meche v. Doucet*, 777 F.3d 237 (5th Cir. 2015). In *Meche*, the plaintiff completed a preemployment questionnaire and was hired in a company's marine division. *Id.* at 245–46. The marine division was then acquired by another company. *Id.* at 245. The successor company re-hired many of the predecessor's employees without requiring renewed medical examinations or questionnaires. *Id.*

The plaintiff made intentional misrepresentations to the predecessor company, but the Fifth Circuit held "that a misrepresentation to [the predecessor] is tantamount to a misrepresentation to [the successor] for the purposes of the *McCorpen* defense." *Id.* at 246. Because "it makes little economic or logical sense to require a successor company to reexamine its predecessor's employees solely for the purpose of avoiding maintenance and cure liability for their previously concealed medical conditions." *Id.* "This is especially true when . . . the predecessor has recently received an application for employment and conducted a thorough medical examination of the seaman, and the successor relied on the seaman's representations on the application and questionnaire when deciding to retain him." *Id.* "After all, a dishonest seaman who previously concealed his or her medical information on a pre-employment questionnaire is unlikely to volunteer that information during a subsequent reexamination." *Id.* at 246 n.18.

In response to a concern that "allowing a current employer to rely on [a] previous employer's medical examination or history or physical would effectively

punish a seaman for his entire life for making a single mistake, " the *Meche* court cabined its ruling to apply only "when a company purchases the division and keeps the predecessor's seamen in its employ. It would not, for example, punish a seaman who leaves his or her employer for an entirely unrelated company." *Id.* at 246 (cleaned up). This court finds *Meche* thoughtful and persuasive.

Here, Mr. Slater underwent a thorough medical examination, conducted by the Coast Guard when he applied for his medical certificate. Though the actual examination was not conducted by MMSI, MMSI relied on the medical determinations made in the exam, which were based upon Mr. Slater's representations in the application. *See* Doc. 66-10 ¶¶ 15–16. MMSI confirmed the certificate's validity "by logging into the U.S. Coast Guard Homeport web site and printing a confirmation page." *Id.* ¶ 13. Mr. Slater attempts to recharacterize the screening process by stating that he "underwent these examinations in order to maintain [his] license, and not at the request of MMSI." Doc. 73-1 ¶ 6. Regardless of what prompted the screening, Mr. Slater acknowledges that MMSI used the medical certificate as a condition of employment, and the medical certificate was issued in reliance on Mr. Slater providing accurate information. Doc. 66-1 at 11. Mr. Slater's reasons for obtaining the certificate do not change that MMSI required it and relied on it in making employment decisions.

Like the successor in *Meche*, MMSI relied on a thorough preemployment medical examination, though MMSI was not the one to conduct it. And the thorough medical examination revealed that Mr. Slater was "free from any medical condition likely to be aggravated by service at sea or to render [Mr. Slater] unfit for such service or to endanger the health of other persons on board." Doc. 66-9 at 13. "[I]t makes little economic . . . sense to require [MMSI] to reexamine [the Coast Guard's examinees] solely for the purpose of avoiding maintenance and cure liability for their previously concealed medical conditions." *Meche*, 777 F.3d at 246. Especially when the previous examination revealed a complete lack of any material medical condition. And it's not clear that subsequent examination would have revealed the ailments. "After all, a dishonest seaman who previously concealed his or her medical information on a pre-employment questionnaire is unlikely to volunteer that information during a subsequent reexamination." *Id.* at 246 n.18.

And, like the successor in *Meche*, MMSI does not seek to punish Mr. Slater throughout his entire life for a single outdated mistake. In hiring Mr. Slater, MMSI did not rely on representations he made to any previous employers, or even on representations he made to the Coast Guard in the past. It relied on his most recent medical certificate and its attendant application and exam. Regardless of Mr. Slater's past misrepresentations, Mr. Slater had a blank-slate opportunity in 2020 to tell the full truth on the Coast Guard medical certificate application, armed with knowledge

that he had to provide MMSI the valid certificate as a condition of his employment. *See* Doc. 66-1 at 11.

Mr. Slater argues that "[t]here is, of necessity, a temporal element lest employers be exposed to the risk of hiring a person based on stale information." Doc. 82 at 9. Mr. Slater contends that if the court allows the 2020 application to count as a "pre-employment exam" for the 2021 hire date, "the term 'pre-employment exam' would be rendered meaningless, because any exam in which an applicant voiced a particular complaint about any physical condition, unlimited in time, could be considered a 'pre-employment exam.'" *Id.* at 8. "If [Mr.] Slater had complained to a doctor about back pain when he was 12 years old, that would be a pre-employment exam under MMSI's reasoning." *Id.* And according to Mr. Slater, "MMSI's argument . . . do[es] not hold water when it is apparent that MMSI does not care about what happens to an employee in a significant intervening period between an examination and alleged 're'-hiring." *Id.* at 7.

Mr. Slater's concerns are overwrought. MMSI did not reach back into Mr. Slater's medical records from when Mr. Slater was twelve years old or some other medical record "unlimited in time." Rather, days after Mr. Slater underwent his August 2020 physical, MMSI logged into the U.S. Department of Homeland Security's portal and confirmed that Mr. Slater was cleared by the Coast Guard and the evaluating physician. *See* Doc. 66-10 ¶ 13. The next year, recognizing that this

Coast Guard medical certificate was still valid and relying on the Coast Guard's evaluation that Mr. Slater was free from medical hindrances—though the evaluation rested on Mr. Slater's lies—MMSI chose to hire Mr. Slater for another term aboard the TURRITELLA. *See id.* ¶¶ 12, 15. This was in line with MMSI's policy of requiring "a valid [Coast Guard] Medical Certificate," *id.* ¶ 16, "before hiring applicants to work as seamen," *id.* ¶ 14. As part of its decision to offer Mr. Slater a renewed Crewmember Employment Agreement, MMSI relied upon the most recent, unexpired Coast Guard medical certificate. *See id.* ¶ 12. Had MMSI claimed that the "pre-employment exam" was an expired Coast Guard medical certificate application from numerous years before Mr. Slater was rehired in 2021, perhaps the situation would be different. But that is not what the record reflects here. Accordingly, the court is satisfied that an application for a Coast Guard medical certificate from the year before Mr. Slater's rehiring suffices as a "pre-employment exam."

Accordingly, the court rejects Mr. Slater's attempt to blame MMSI for relying on his false answers to a thorough medical inquiry—one which MMSI regularly relied on in its hiring decisions. And the court finds that Mr. Slater's misrepresentations on the Coast Guard medical certificate application suffice for application of the *McCorpen* defense.

29

### 2. Mr. Slater intentionally misrepresented or concealed medical facts about his back ailments.

The intentional misrepresentation element of the *McCorpen* defense "does not require a finding of subjective intent." *Brown*, 410 F.3d at 174 (cleaned up). Instead, maintenance and cure may be denied for failure to disclose a medical condition "if [the seaman] has been asked to reveal it." *Id.* (cleaned up). "*McCorpen*'s intentional concealment prong neither necessarily turns on credibility nor requires a subjective determination." *Id.* at 175. "Seamen must not be allowed to blatantly misrepresent their medical history on questionnaires and then plead ignorance before a jury." *Id.* So "[f]ailure to disclose medical information in an interview or questionnaire that is obviously designed to elicit such information therefore satisfies the intentional concealment requirement." *Id.* at 174 (cleaned up).

Here, the Coast Guard medical certificate application form was clearly directed to the issue of determining Mr. Slater's health history relating to his back. *See* Doc. 66-1 at 17 ("Have you ever had back problems?"). The application asked about previous surgeries, *id.* at 13, and "back problems," *id.* at 17. And in response to each of these questions, Mr. Slater falsely answered that he had neither. *Id.* at 17, 33. Mr. Slater gave false answers despite knowing that the "medical certificate is not only to make sure that [Mr. Slater is] okay. It also makes sure that [Mr. Slater is] safe to work around others." *Id.* at 11.

Mr. Slater provides no evidence of any difficulty he had in understanding the questions. *See McCorpen*, 396 F.2d at 549–50 (discussing cases where the defense was denied because the employee who lied had severe language difficulties). Mr. Slater has given this court no reason to believe that he is not "a man of intelligence who can read, write, speak, and understand English." *Id.* at 550. Mr. Slater admitted that he lied and provided inaccurate information. Doc. 66-1 at 16 ("Yes, I have not put down the correct information on some things.").

Rather, Mr. Slater seems to allege that this was just an oversight. According to Mr. Slater, he "didn't just read it. [He] just went down and checked NO . . . on all of those. [He] shouldn't have, but [he] did." *Id.* at 21. But the record shows that even when Mr. Slater took the time to read the questions on his other medical certificate applications, he still failed to truthfully disclose his medical condition. On his 2011 application, Mr. Slater disclosed his previous back problems, but he did so incompletely. *See* Doc. 73-4 at 19 (disclosing his surgery in 2000, but failing to mention his surgery from 2009). And on his 2022 application, Mr. Slater marked "YES" on three conditions, meaning he read at least some of the conditions, and yet still marked "NO" on several questions for which he should have marked "YES." *See* Doc. 66-7 at 16; Doc. 66-1 at 34 ("[Y]ou had five of them that should have been YES, and you checked NO, correct?" "Yes."). The court acknowledges that the 2011 and 2022 applications were not the operative application at the time Mr. Slater was

hired, but they belie Mr. Slater's explanation that his 2020 misrepresentations were just a lack of reading the list.

Despite Mr. Slater's denial of any back problems, Mr. Slater continued to experience pain in the wake of his surgeries, and he continued to seek treatment. Doc. 66-1 at 24. As of June 2021, Mr. Slater was still seeking treatment for "chronic back pain." *Id.* at 26. As late as fifteen days before the accident that led to this lawsuit, Mr. Slater had prescription medications for chronic pain and muscle spasms. *Id.* at 27. Mr. Slater admits that his answer on the medical certificate application was inaccurate regarding his recurrent back issues. *Id.* at 21. Accordingly, this court finds that there is no dispute as to Mr. Slater's intentional misrepresentation of facts regarding his back problems.

### 3. The misrepresented or concealed facts about Mr. Slater's back ailments were material to MMSI's hiring decision.

"The fact that an employer asks a specific medical question on an application, and that the inquiry is rationally related to the applicant's physical ability to perform his job duties, renders the information material for the purpose of this analysis." *Brown*, 410 F.3d at 175. Mr. Slater admitted that in the process of getting his certificate, he was asked, "Have you ever had back problems?" Doc. 66-1 at 17. Considering the demanding job responsibilities Mr. Slater was to have upon hiring, Doc. 66-8 at 7–9 (describing job responsibilities of a marine foreman), this question is rationally related to a physical ability to perform those responsibilities.

Mr. Slater, by his own admission, understood that a valid medical certificate was a condition of being hired and that the medical certificate relied upon accurate information given by him. Doc. 66-1 at 11, 17. Mr. Reneau was personally involved in handling Mr. Slater's 2021 hiring, and his testimony shows that in 2021, as always, MMSI relied on the Coast Guard medical certificate in making its hiring decisions. *See* Doc. 66-10. "MMSI further confirmed that Mr. Slater had a valid [Coast Guard] Medical Certificate issued on August 17, 2020 by logging into the U.S. Coast Guard Homeport web site and printing a confirmation page." *Id.* ¶ 13. MMSI sought evidence from an evaluating physician stating that he was fit for duty, based on what were supposed to be Mr. Slater's truthful answers to a detailed questionnaire. This is the epitome of reliance. *See id.* ¶ 16 ("Without a valid [Coast Guard] Medical Certificate, MMSI would not have hired Mr. Slater to work on the FPSO TURRITELLA or any other ship.").

Mr. Slater contends that because his misrepresentations were not contained on the medical certificate but rather were on the application for the medical certificate, which was not submitted to MMSI, MMSI could not have relied on his misrepresentations. *See* Doc. 79 at 19; Doc. 82 at 9–10 ("An employer cannot rely upon any medical fact it discovers *after* a person is injured . . . when it actually took the time to obtain the medical questionnaires *after* [Mr.] Slater was injured and *after* it was aware [Mr.] Slater was making a claim against it – there being no evidence

that MMSI reviewed any such information at the time it hired [Mr.] Slater . . . .”). According to Mr. Slater, the doctor acts as an agent for MMSI, and if the back problems were not material to the doctor, they cannot be material to MMSI. *See* Doc. 79 at 20. This argument fails. MMSI relied on the certificate that stated that Mr. Slater was “free from any medical condition likely to be aggravated by service at sea or to render [Mr. Slater] unfit for such service or to endanger the health of other persons on board.” Doc. 66-9 at 13. And Mr. Slater has given this court no reason to think that the doctor would have issued this statement—one seemingly contradictory to Mr. Slater’s entire medical history—had the doctor known of Mr. Slater’s true condition.

Mr. Slater disagrees. Mr. Slater contends that even if he made full disclosures on the application, his back problems would not have been material to the physician, and he still would have obtained the clearance. *See* Doc. 79 at 11. According to Mr. Slater, “on the occasions when [Mr.] Slater disclosed his prior back injury . . . the examining physician issued [Mr.] Slater a USCG Medical Certificate even when such information was available to the physician.” Doc. 82 at 10. Mr. Slater cites his 2011 Coast Guard medical certificate application, in which he did indicate prior back problems. *Id.* (citing Doc. 73-4). In his 2011 application, Mr. Slater made disclosures about “Ruptured/herniated disc” and “Back surgery or injury.” *See* Doc. 73-4 at 19. But in the section allotted for explaining the condition, Mr. Slater wrote “Ruptured

L1 + L2 disc in 1999 and had surgery in 2000 back is fine now." *Id.* What Mr. Slater failed to admit—in his briefing and in his 2011 application—is that this is not the complete truth. Mr. Slater had a back surgery in 2009. Doc. 66-1 at 12 ("Did you have surgery in 2008 or 2009[?]" "Yes." . . . "What are the details of that surgery?" . . . "It was a . . . spinal discectomy on 2 and 3, the bulging disc."). But this 2009 surgery—that occurred just two years prior to his 2011 application—appears nowhere in his disclosure of self-admitted back problems. *See* Doc. 73-4 at 19. Nor is there any mention of the pain management Mr. Slater sought in the months and years after his 2009 surgery, which belie his conclusion on the application that he "had surgery in 2000 [but] back is fine now." *See id.*; *see also* Doc. 66-4 at 6 (showing that Mr. Slater received treatment for continued back pain in late 2009 after his 2009 back surgery). So the fact that a doctor issued Mr. Slater a medical certificate in 2011—based on glaring omissions in the application—does not establish that a doctor apprised of Mr. Slater's full medical history in 2020 would have cleared him for duty.

Mr. Slater also offers his 2022 medical certificate as evidence that his back problems were not material to the evaluating physicians. *See* Doc. 82 at 10. In 2022, Mr. Slater's evaluating physician noted a "[s]urgical scar midline lumbar region." Doc. 66-10 at 32. From this, Mr. Slater asks the court to conclude that based solely on the scar, the doctor was fully apprised of Mr. Slater's entire history relating to his

back and was thus competent enough to make an informed determination of his fitness, a decision he made in Mr. Slater's favor. *See* Doc. 79 at 20–21. There are two problems with Mr. Slater's contention.

*First*, the *McCorpen* defense depends on a seaman's lies in a pre-hiring evaluation. *See McCorpen*, 396 F.2d at 549. Mr. Slater's evaluation for the 2022 medical certificate was done on May 12, 2022. Doc. 66-7 at 20. There is no indication in the record that MMSI hired Mr. Slater after this physical exam was completed or that MMSI ever relied on this exam for any purpose.

*Second*, on the 2022 application, Mr. Slater still denied having any back or joint problems or any prior surgeries. *Id.* at 16. The evaluating physician noted a "[s]urgical scar midline lumbar region." *Id.* at 18. From that, the doctor—and according to Mr. Slater, MMSI—were supposed to know the full extent of Mr. Slater's lengthy history with back pain despite the answer on the application that affirmatively denied such history. The application instructions tell the evaluating physician that "[i]f the Medical Practitioner discovers a condition not reported by the applicant, they must check YES in the appropriate block in III(a) and provide information on the condition, as requested, in Section III(b)." *Id.* at 13. The evaluating physician did neither of those things. *See id.* at 16–17. So, once again, even if MMSI had investigated the 2022 application—submitted well after the incident in question and any alleged hiring—MMSI could have concluded that

36

despite the notation of a scar on his back, the doctor did not find any surgical history or history of back problems because the doctor noted a scar but did not check the box, as the doctor was instructed to do if she "discover[ed] a condition not reported by the applicant." *Id.* at 13.

Mr. Slater seems to argue that MMSI implicitly relied on this 2022 application because it "chose not to review the documentation which [Mr.] Slater completed in conjunction with the Medical Certificates" and "MMSI returned [Mr.] Slater to work without question aboard the TURRITELLA for two additional hitches." Doc. 82 at 10. As with Mr. Slater's 2011 application, any actions that Mr. Slater took after his 2022 application are irrelevant to MMSI's *McCorpen* defense because they do not bear on what MMSI looked at or relied upon at the time it hired Mr. Slater. Similarly, that Mr. Slater also successfully worked full hitches after his 2020 application does not change the materiality of the information on the application to MMSI's decision to hire him. *See Brown*, 410 F.3d at 175 ("Brown's counterargument—that he could perform heavy labor tasks for his first few months on the job—is irrelevant: Parker Drilling based its hiring decision . . . upon whether applicants had "Past or Present Back and Neck Trouble," not whether they could, on the date of their application, complete difficult manual labor tasks.").

Mr. Slater also attempts to impute knowledge of an onboard TURRITELLA medic to MMSI regarding his back injuries. Doc. 79 at 23. Mr. Slater contends that

"the medic aboard the TURITELLA knew that [Mr.] Slater had a history of back surgery." *Id.* "Yet, despite this history, MMSI admits that [Mr.] Slater returned to work aboard the TURRITELLA for two full hitches." *Id.* According to Mr. Slater, "[t]his attempted ignorance of the medic's report calls into question the veracity of any claims by MMSI that prior back injuries were material in its hiring and assignment of [Mr.] Slater to the TURRITELLA." *Id.* This is irrelevant to the *McCorpen* defense. Any information MMSI gathered after Mr. Slater's injury by its very nature could not have been accounted for in making a pre-injury hiring decision. Further, Mr. Reneau testified that "[t]he ship's medic's logs were managed by a separate contractor of Shell called SMS and were not created or maintained by an MMSI employee." Doc. 81 ¶ 6. "Thus, whatever the medic's records may have reflected after the 2022 incident, MMSI was not aware of the contents of those records at the time that Mr. Slater was hired to work his last two hitches with MMSI after the 2022 incident." *Id.*

And even were MMSI aware of the medic's knowledge that Mr. Slater had some prior back surgery, Mr. Slater has given the court no reason to think that the medic knew of Mr. Slater's full, storied medical history. Even if one prior back injury were not material to MMSI, a lengthy history of recurrent back problems certainly could be.

Accordingly, MMSI has established its reliance on Mr. Slater's incomplete disclosure of his medical condition.

### 4. The concealed pre-existing back injuries and the back injuries complained of in this lawsuit are sufficiently connected.

To prevail on its defense, MMSI must prove a causal connection between the misrepresented facts and the injury Mr. Slater sustained on the job. The Eleventh Circuit has said that "[a]lthough the two injuries do not have to be identical, . . . simply showing that [the plaintiff's] previous pain and her injury from the fall affect the same body part without more specificity does not suffice." *Jackson*, 730 F. App'x at 790. The Eleventh Circuit reiterated the *Brown* court's finding of no causation where "the employer failed to show 'that the claimant in fact suffered from a preexisting condition or disability.'" *Id.* (quoting *Brown*, 410 F.3d at 177 n.9). Similarly, the causation element was not met where "the employer failed to show 'that the claimant's preexisting disability was identical or similar, and there was no evidence of a previous similar diagnosis.'" *Id.* (quoting *Brown*, 410 F.3d at 177 n.9). But causation is met where "the injuries were to the [exact] same location of the lumbar spine." *Id.* (quoting *Brown*, 410 F.3d at 177 n.9).

Mr. Slater heavily relies on *Jackson*, in which the Eleventh Circuit found that the third element of the *McCorpen* defense was not met. *See id.*; Doc. 79 at 24–26. In *Jackson*, the plaintiff had a preexisting degenerative disc disease at L2-L3 and L3-L4. 730 F. App'x at 790. The plaintiff then suffered a traumatic fall, which

caused lumbar disc herniation at L4-L5 and L5-S1 and required surgery to remediate. *Id.* The Eleventh Circuit found insufficient causal connection because the record showed nothing more than an acute injury to a different part of the back from where the degenerative condition existed. *See id. Jackson* suggests that it is insufficient to show only that the pre-injury pain and post-injury pain affect the same general body part (the lower back). *See id.* But "the two injuries do not have to be identical." *Id.*

The records of Mr. Slater's back injuries post-February 25, 2022, reveal a sufficient connection to his previous disc conditions. *First*, the concealed conditions and the injuries complained of in this lawsuit affect the same levels of Mr. Slater's spine. The record does not reveal with complete clarity the full extent of Mr. Slater's back diagnoses prior to the February 25, 2022, incident, but the record reflects that he suffered from multilevel issues. *See* Doc. 66-11 at 5–6, 10, 15–16, 23–24, 28. Mr. Slater previously injured his L2-L3 vertebrae while at sea, *see* Doc. 66-1 at 12, and at some point prior to February 25, 2022, he had surgeries on L4-L5 and likely other levels as well, *see* Doc. 66-11 at 24 ("L4-L5: Previous surgery on the right."); *id.* at 14 ("[Mr. Slater] does state he also had a prior back surgery at different levels in Houston."); *id.* at 23 ("He admits to 3 previous spine surgeries . . . ."); *id.* at 6 ("L5-S1 shows the previous changes with Modic changes."). Now, in the wake of the February 25, 2022, incident, Mr. Slater suffers from significant back issues, affecting

the L2-L3 and L4-L5 vertebrae, among others, at least some of which were likely treated via previous surgery. *See, e.g.*, *id.* at 24 (listing Mr. Slater's diagnoses).

Mr. Slater does not dispute that his injuries before the February 25, 2022, incident and his injuries after the incident are to the same portion of his back. *See* Doc. 79 at 10 ("[Mr.] Slater does not contest that he suffered a back injury in the accident and that he suffered injuries to the same part of his back previously . . . .").

*Second*, the injuries complained of in this lawsuit are of the same type that Mr. Slater suffered before the February 25, 2022, incident. MMSI argues that "[Mr.] Slater's earlier injuries were work-related, acute episodes, not degenerative or recurring problems . . . , and that is exactly what [Mr.] Slater alleges as his current injury: a work-related, acute injury at sea." Doc. 67 at 11. The record does reflect two acute, work-related injuries to Mr. Slater's back. *See* Doc. 66-1 at 16; Doc. 66-4 at 6. Several of Mr. Slater's doctors noted that Mr. Slater suffers from "degenerative" or "recurrent" back problems, *see, e.g.*, Doc. 66-11 at 10, 15, 23, 24, that were "chronic" before the February 25, 2022, incident, *see id.* at 8–9. And some of those problems required decompression surgeries to remediate them, though the surgeries did not resolve the recurrent herniations and stenosis. *See id.* at 28. Further, Mr. Slater admitted to seeking pain management treatment for over a decade for

back pain that was "constant" with varying intensity. Doc. 66-1 at 22; Doc. 66-5 at 3.

In addition to the seemingly continuous—or at least chronic but intermittent—nature of Mr. Slater's back injuries prior to February 25, 2022, one of Mr. Slater's doctors "relate[d] his symptoms and need for treatment to the injury of February 25, 2022." Doc. 66-11 at 16. And that doctor concluded that Mr. Slater's current pain results from "[c]hronic back pain which was worsened both in intensity and frequency by his recent injury." *Id.* at 9. Mr. Slater's doctors all agree that he required treatment for herniated discs at several levels of his lumbar spine in his visits after the February 25, 2022, incident. *See id.* at 4–6, 10, 16, 23, 24, 28.

Accordingly, the record shows that Mr. Slater complains of damaged discs allegedly caused by an acute, on-the-job injury due to his unstable footing during the February 25, 2022, fast rescue craft incident. Acute, on-the-job injuries are what Mr. Slater suffered in the two early-2000s incidents, with their corresponding surgeries. This, combined with the doctor's notations that Mr. Slater suffers from "degenerative" and "recurren[t]" back problems, *see, e.g.*, *id.* at 28, that were aggravated by the incident, satisfies the court that the surgeries and back injuries that Mr. Slater concealed have a connection to his current injuries.

Mr. Slater alleges that MMSI has not provided any evidence "as to the nature and extent of [his] prior back injuries," such as a diagnostic test showing the exact

nature of Mr. Slater's back injuries after the accidents in the early 2000s. Doc. 79 at 25. But Mr. Slater's own testimony shows that at least two of Mr. Slater's back injuries were acute injuries from accidents that occurred at sea, *see* Doc. 66-1 at 16; Doc. 66-4 at 6, and that because of those accidents, he required a surgery to remediate "a large herniated lumbar disc at L2-3," Doc. 66-4 at 5; Doc. 66-1 at 18 (explaining that his two surgeries in the early 2000s were the same procedure). And Mr. Slater's medical records reveal that Mr. Slater had at least one other surgery that did not completely treat the "recurrence of herniation" at the L4-L5 level. *See, e.g.*, Doc. 66-11 at 28; *see also Brown*, 410 F.3d at 176 ("Parker Drilling need not prove that the prior injuries are the sole causes of the herniation. It need only show a *causal relationship* between the prior injuries and the herniation.").

The record does not clearly establish whether Mr. Slater's "pretty significant multilevel degenerative changes," Doc. 66-11 at 28, existed prior to the February 25, 2022, incident. But the record does show that on at least three occasions, Mr. Slater required surgery to treat herniations to the same parts of his spine about which he now complains and that in the wake of those surgeries, Mr. Slater sought professional help managing the chronic pain for over a decade before the incident. *See id.* at 8 ("Obviously the patient had chronic ongoing low back pain."). The court is satisfied that there is a connection between Mr. Slater's concealed previous

herniations and the "[m]ultilevel lumbar herniations," *id.* at 5, of which Mr. Slater now complains.

Mr. Slater even alleges in his complaint that "if it be shown that [he] was suffering from some pre-existing injury, disease and/or condition, then such was aggravated and/or exacerbated as a proximate result of the occurrence made the basis of this lawsuit." Doc. 71 at 5. The record shows that Mr. Slater suffered from a back condition prior to the February 25, 2022, incident, as he had at least three surgeries to correct it and sought pain management treatment for nearly two decades. Mr. Slater's contention that such pre-existing back condition was aggravated by the incident satisfies the court that there exists a connection between the non-disclosed facts and the injuries complained of in this lawsuit. *See Meche*, 777 F.3d at 249 (holding that the causal link was "unequivocally satisfied" where the incident aggravated a pre-existing condition).

MMSI specifically "does not concede that [Mr.] Slater's current back injuries were caused by the February 22 incident at sea." Doc. 67 at 11 n.6. Rather, MMSI emphasizes that Mr. Slater maintained for several months post-incident that the injury was one to his groin, rather than his back. *See id.* ¶¶ 19–28; Doc. 78 ¶ 19 ("Although [MMSI] do[es] not dispute that [Mr.] Slater reported a *groin* injury at the time of the accident, the nature and extent of his injury is disputed. Slater reported only a groin injury and never reported any kind of back injury to [MMSI]."). But

Mr. Slater is not entitled to maintenance and cure regardless of whether he can ultimately prove that his current back injuries were caused by the February 25, 2022, incident. Were his current back injuries caused by the incident, his claim for maintenance and cure is barred by the *McCorpen* defense. Were his back injuries not caused by the February 25, 2022, incident, Mr. Slater cannot establish a *prima facie* case for entitlement to maintenance and cure.

Accordingly, the court **GRANTS** MMSI's motion for summary judgment as to maintenance and cure. The court **DENIES** Mr. Slater's motion for summary judgment as to maintenance and cure.

### B. Contributory Negligence

"Under the Jones Act, seamen are afforded rights parallel to those of railway employees under the Federal Employers' Liability Act ('FELA')." *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997). Section 51 of the FELA provides, in pertinent part, that "[e]very common carrier by railroad . . . shall be liable in damages . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51. "A seaman is entitled to recovery under the Jones Act, therefore, if his employer's negligence is the cause, in whole or in part, of his injury." *Gautreaux*, 107 F.3d at 335.

"Under maritime law, the comparative negligence of a plaintiff applies equally to both theories of [Jones Act negligence and unseaworthiness]. . . . In either circumstance, a plaintiff's contributory negligence will not bar his recovery, but will reduce his damage award." *Scott v. Fluor Ocean Servs., Inc.*, 501 F.2d 983, 984 (5th Cir. 1974). "Where a seaman knowingly exposes himself to conditions of employment while aware of an illness or disability which makes those conditions unsafe to him, or where a seaman has the possibility of securing relief from unsafe conditions by informing his superiors of them, but continues to work without doing so, he may be found to be contributorily negligent." *Savoie v. Otto Candies, Inc.*, 692 F.2d 363, 372 (5th Cir. 1982).

MMSI cites an unpublished Southern District of Alabama case addressing contributory negligence where a seaman concealed material information about his condition. Doc. 67 at 13 (citing *Kuithe v. Gulf Caribe Mar., Inc.*, No. 08-0458-WS-C, 2010 WL 3419998 (S.D. Ala. Aug. 26, 2010)). The *Kuithe* court applied the rule from a 2008 Fifth Circuit case that "contributory negligence may be found where a seaman has concealed material information about a pre-existing injury or physical condition from his employer; exposes his body to a risk of reinjury or aggravation of the condition; and then suffers reinjury or aggravation injury. *See* 2010 WL 3419998, at *5 (quoting *Johnson*, 544 F.3d at 303–04). The *Kuithe* court noted that "[t]he defendant cite[d] no binding precedent for this proposition, but the plaintiff

ha[d] not objected to [*Johnson*'s] employment in th[at] case." *Id.* at *5 n.10. That is not the case here. Mr. Slater "objects and avers that MMSI cannot rely upon [*Johnson*] as binding upon this Court." Doc. 79 at 26.

In the absence of clear, binding precedent addressing the issue of contributory negligence where a seaman concealed material information about his condition, the court will apply the general standard for negligence in maritime cases.

Previously, as to the duty of care, the Fifth Circuit in *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 223 (5th Cir. 1975), stated that "[t]he duty owed by an employer to a seaman is so broad that it encompasses the duty to provide a safe place to work. . . . By comparison, the seaman's duty to protect himself . . . is slight." From this, a heightened duty on the part of the employer and a "slight" duty on the part of the seaman developed. *See, e.g.*, *Dempsey v. Mac Towing, Inc.*, 876 F.2d 1538, 1542, 1544 (11th Cir. 1989) (describing the "slight" duty of the seaman to protect himself and the "very high" standard of care owed by the shipowner).

Then, in 1997 the Fifth Circuit revisited the duty of care owed by the employer and the duty of care owed by the seaman to protect himself. *See Gautreaux*, 107 F.3d 331. The Fifth Circuit addressed the "much confusion in [the Fifth] Circuit as to the proper standard of care by which juries should measure a plaintiff's duty under the Jones Act to protect himself." *Id.* at 334. The court acknowledged that it had been "less than clear in its articulation of the proper standard of care to which seamen are

bound" and had "vacillated considerably in [its] pronunciations of the proper standard of care." *Id.* at 334, 336. This led to courts unpredictably using both the "slight care" and "ordinary care" standards. *See generally id.* (tracing the evolution and various uses of the different standards).

After revisiting the applicable statutory text, the Fifth Circuit held that both the employer and the seaman were always held to a reasonable person/ordinary prudence standard. *Id.* at 339. "In their earlier articulations of § 51 liability, courts had replaced the phrase 'in whole or in part' with the adjective 'slightest.'" *Id.* at 335. But "[n]othing in these cases . . . supports the proposition that the duty of care owed is slight." *Id.* "Rather, the phrase 'in whole or in part' as set forth in the statute, or, as it has come to be known, 'slightest,' modifies only the causation prong of the inquiry." *Id.* "The phrase does not also modify the word 'negligence.' The duty of care owed, therefore, under normal rules of statutory construction, retains the usual and familiar definition of ordinary prudence." *Id.* "[A]n employer's duty of care always remained that of *ordinary* negligence." *Id.*

*Gautreaux* expressly overruled *Spinks*, *id.* at 339, but did not (and could not have) overruled *Dempsey*. The Eleventh Circuit has not addressed the issue of the standard in a published opinion since *Dempsey*. However, the comments to the 2005 Eleventh Circuit Pattern Jury Instruction specifically cited *Gautreaux* and stated:

> The Jones Act refers to the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*, in affording

recovery rights to Jones Act plaintiffs. *See Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997) (en banc). Under some prior Fifth Circuit precedent binding on the Eleventh Circuit, employees under FELA only had to exercise a "slight duty of care" toward their own safety, effectively placing a higher standard, comparatively speaking, upon the employer. *See Spinks v. Chevron Oil Co.*, 507 F.2d 216 (5th Cir. 1975); *Allen v. Seacoast Products, Inc.*, 623 F.2d 355 (5th Cir. 1980).

Clarifying and overruling those prior Fifth Circuit cases, the Fifth Circuit concluded that both the employer and employee are held to the same standard of care, (i.e., an employee is obligated under the FELA to act with ordinary prudence). *Gautreaux*, 107 F.3d at 335 (5th Cir. 1997). The Fifth Circuit has noted that "[i]n *Gautreaux*, we held that 'nothing in the text or structure of the FELA–Jones Act legislation suggests that the standard of care to be attributed to either an employer or an employee is anything different than ordinary prudence under the circumstances.' "*Crawford v. Falcon Drilling Co. Inc.*, 131 F.3d 1120, 1125 (5th Cir. 1997) (citing *Gautreaux*, 107 F.3d at 338).

Pattern Civ. Jury Instr. 11th Cir., cmt. at 361 (2005). And the comments to the

Pattern Jury instructions instructed on the burden regarding causation:

However, the relaxed rule concerning the issue of *causation* under the Jones Act remains the same as it was before *Gautreaux.* Under that rule, reflected in this instruction, an employer's negligence is actionable if it "played any part, even the slightest, in producing the injury or death for which damages are sought."

Pattern Civ. Jury Instr. 11th Cir., cmt. at 362 (2005). The Eleventh Circuit Pattern

Jury Instructions still use the language from the 2005 pattern. *See* Pattern Civ. Jury

Instr. 11th Cir. 8.1 (2025).

Regardless whether Mr. Slater's duty was only slight or one of ordinary prudence, genuine disputes of material fact preclude the court from granting summary judgment to MMSI based on Mr. Slater's alleged contributory negligence. Mr. Slater twice sustained back injuries at sea while doing the work of a seaman. *See* Doc. 66-1 at 8. Mr. Slater was receiving treatment for back problems, including medication for recurrent muscle spasms, up until his deployment on the TURRITELLA. *See* Doc. 66-1 at 25–26; Doc. 66-6 at 11. And by his own admission, he knew that the required medical certificate was "based upon accurate medical information" he was to provide. Doc. 66-1 at 17. Mr. Slater gave false answers despite knowing that the "medical certificate is not only to make sure that [Mr. Slater is] okay. It also makes sure that [Mr. Slater is] safe to work around others." *Id.* at 11. He specifically denied having "any medical condition likely to be aggravated by service at sea." Doc. 66-9 at 12–14; Doc. 66-1 at 10–11.

The record also shows, however, that for seven or eight years prior to the February 2022 incident, Mr. Slater worked aboard the TURRITELLA without issue. *See* Doc. 73-1 ¶ 12. And he believed himself to be fit for duty from the first day he was hired by MMSI. *Id.* Even after the February 2022 incident, he returned to work with MMSI without a problem for two more hitches of nearly thirty days each. *See* Doc. 66-1 at 34.

Because Mr. Slater believed himself to be fit for duty and believed that his back problems did not make sea conditions unsafe for him, and he had not had any incidents aboard the TURRITELLA prior to his 2020 application, there is a genuine dispute as to whether Mr. Slater breached his duty of care when he failed to disclose his back problems such that he was contributorily negligent in his duty to protect himself.

MMSI has not explained why such a factual question is appropriate for the court to make at this stage. MMSI cites an unpublished district court case for the rule that "a plaintiff is negligent in concealing prior medical conditions that mean exposure to risk of reinjury or aggravation as a seaman." Doc. 67 at 13 (citing *Kuithe*, 2010 WL 3419998). In that case, the judge made findings about contributory negligence as part of a bench trial. *Kuithe*, 2010 WL 3419998, at *1, *7. But this case is not before the court on a bench trial. The court declines to make a factual finding on summary judgment about Mr. Slater's prudence. Accordingly, the court **DENIES** MMSI's motion for summary judgment as to Mr. Slater's contributory negligence.

### C. Mr. Slater's Claims Against MMSI for Negligence

Mr. Slater asserts claims for negligence under the Jones Act and negligence under general maritime law. *See* Doc. 40. "The Jones Act provides a cause of action in negligence for any seaman injured in the course of his employment." *Chandris,*

51

*Inc. v. Latsis*, 515 U.S. 347, 354 (1995) (cleaned up). And "a maritime tort case . . .

rel[ies] on general principles of negligence law," so "[t]he [seaman] is owed a duty

of ordinary care." *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980).

Accordingly, for both of Mr. Slater's negligence claims, MMSI owed Mr. Slater a

duty of "ordinary prudence under the circumstances." *See Gautreaux*, 107 F.3d at

338 ("We agree . . . that nothing in the text or structure of the . . . Jones Act . . .

suggests that the standard of care to be attributed to either an employer or an

employee is anything different than ordinary prudence under the circumstances.").

Mr. Slater contends, based on his expert Captain Geoffrey Davis's findings, that

MMSI breached its duty to Mr. Slater in several ways. *See* Doc. 69 at 16–21.

*First*, Captain Davis concluded that MMSI "did not properly identify and

mitigate risks prior to launching of the [fast rescue craft]" because it "did not

consider the significance of the sea conditions in relation to the [fast rescue craft]

crew members maintaining footing in the [fast rescue craft]." Doc. 65-10 at 20.

"[S]enior leadership onboard the Turritella and ashore should not have authorized

the launching of the [fast rescue craft] in four-six-foot seas." *Id.* Captain Davis

concluded that "[t]he rough sea conditions and heavy movement of the [fast rescue

craft] made it difficult for personnel to maintain footing." *Id.* at 30. "Due to the

nature of the job requirement being non-urgent, the FPSO should have planned the

launch on a calmer day." *Id.* According to Captain Davis, "it's evident that the

weather was too rough for launching the [fast rescue craft] for a non-urgent matter." *Id.* at 31.

MMSI, through Captain Claudiu C. Iordache, disagrees with Captain Davis's assessment. *See* Doc. 78 at 13–15. Captain Iordache, an experienced seaman who was present—and responsible for the launch—the day of the incident, concluded that "the prevailing conditions were suitable for the drill." Doc. 75-2 ¶¶ 4–5, 12. Captain Iordache testified that he considered the "sea states on the day of the launch," among several other factors. Doc. 75-3 at 7. He was involved in risk assessment regarding the launch of the fast rescue craft. *Id.* at 8. Captain Iordache concluded that there was good visibility, and the swells were "at maximum . . . 1 meter, which is three feet." *Id.* at 10. And based on his experience, "the prevailing conditions were suitable for the drill," Doc. 75-2 ¶ 12, and so the "judgment call" was made to launch the fast rescue craft, Doc. 75-3 at 10.

*Second*, Captain Davis concluded that MMSI's failure to launch Lifeboat #4 to rescue the fast rescue craft—as the launch plan suggested—was not appropriate. *See* Doc. 65-10 at 23, 26. And based on Mr. Slater's speculation that the lack of Lifeboat #4 was due to insufficient manpower, Captain Davis concluded that MMSI "should not have authorized this manning arrangement." *Id.* According to Captain Davis, "going outside of the guidelines of a preplanned rescue presents a lot of risk." *Id.* at 27.

Captain Iordache disagrees. Captain Iordache admitted that the Job Safety Analysis signed by the crew prior to the launch indicated that in the event of engine failure, "if issue can not be resolved ask for Lifeboat 4 to be dispatched to assist in bringing the [fast rescue craft] back to davit pick up point." Doc. 75-3 at 14, 53. But Captain Iordache explained that the TURRITELLA crew ultimately used a supply boat rather than Lifeboat #4 because it is a "bigger and easier way to intervene." *Id.* at 14. According to Captain Iordache, "standard procedure is that the standby boat can be an offshore supply vessel . . . or Lifeboat #4 on Turritella." Doc. 75-2 ¶ 8. "Standard procedure is to first rely on an [offshore supply vessel] for retrieval if one is available, which is the quickest and safest option for retrieval because the [offshore supply vessel] is already in the water and there is no need to launch a lifeboat." *Id.* "If an [offshore supply vessel] is not available, then Lifeboat #4 would be launched to retrieve the disabled [fast rescue craft]." *Id.* "This procedure was based on consideration of the risks involved with retrieving a disabled [fast rescue craft]." *Id.* According to Captain Iordache, "[p]er standard procedure, the Harvey Stone, rather than Lifeboat #4, was used to assist with rescuing the disabled [fast rescue craft]." *Id.* ¶ 10.

Captain Iordache was asked at his deposition, "So there was a written [plan] for that . . . which was to launch the lifeboat . . . and I – I don't have any reason to disagree with you. In fact, I think you may be right, that there was an alternative to

54

use a supply vessel and move the lifeboat; right?" Doc. 75-3 at 17–18. Captain Iordache responded affirmatively. *Id.* at 18. Captain Iordache explained that while they had a plan for possible accidents during the launch, "[t]here are many influences, the boat, the weather, the position," and "[they] try to adapt and make everything safe for the people first." *Id.* And though "[t]here is no procedure written to perform a rescue" because they cannot predict every eventuality, Captain Iordache used the risk assessment and the procedure and tried to "maintain the procedure" while adapting "to find a safe way when out on the seas between the captain and the supply boat and the FPSO, the safest way to perform a rescue." *Id.*

Captain Iordache also testified that the TURRITELLA had "enough personnel to man both boats," *id.* at 14, which directly contradicts Mr. Slater's speculation that Lifeboat #4 was not dispatched due to lack of personnel. And Captain Iordache disagreed that "the seas were too rough" for the HARVEY STONE to rescue the fast rescue craft. *Id.* at 17. He testified that while Mr. Slater claims that the fast rescue craft was adrift for an hour and ten minutes, *see* Doc. 69 ¶ 17, "[t]he boat was recovered way before" because the "rescue boat was . . . alongside the supply boat for that period until [they] were able to recover it," Doc. 75-3 at 16. So the fast rescue craft "[w]asn't drifting for that full hour." *Id.*

*Third*, Captain Davis concluded that "[w]hen the [fast rescue craft] experienced engine failure, movement of the vessel increased." Doc. 65-10 at 37.

"Had the recurring engine issue of the [fast rescue craft] been factored into the job planning, [senior management] would have concluded that launching the [fast rescue craft] was not prudent." *Id.* at 20. "[T]he recurring nature of the engine failure should have been analyzed and addressed prior to launching for a non-urgent launching." *Id.* at 38. "[T]he maintenance history for the [fast rescue craft] was a warning sign that the operational integrity of the vessel was lacking." *Id.* And "[i]f the [fast rescue craft] would have had the fuse onboard the day of the incident, the risk exposure would have been less." *Id.*

Captain Iordache disagrees. According to Captain Iordache, "[b]etween February 6, 2022, when the [fast rescue craft] engine was last repaired for running issues, and the February 25, 2022 launch, there were no known issues with the [fast rescue craft] engine running improperly." Doc. 75-2 ¶ 6. And "prior to launching the [fast rescue craft] on February 25, 2022, the [fast rescue craft] crew ran the engine to ensure it was working properly. The engine ran properly, and no issues were discovered during the pre-launch engine test." *Id.* ¶ 7. Captain Iordache did admit that after the incident, MMSI updated the toolbox with spare fuses. Doc. 75-3 at 21.

Mr. Slater contends that Captain Iordache's testimony is not sufficient to create a genuine dispute of material fact because Mr. Slater's arguments and Captain Davis's conclusions "are derived straight from [MMSI's] own documents." Doc. 82 at 12. Mr. Slater points to MMSI's incident report, which asked "What solution(s)

do we have in mind?" and included several things including: "[e]stablish a (formal or informal) tolerance threshold for recurring engine failures on [fast rescue crafts]" and "[r]eview current secondary [fast rescue craft] recovery process for effectiveness." *Id.* at 12–14 (cleaned up) (quoting Doc. 65-6 at 4). Mr. Slater asserts that even if MMSI had a plan to recover the fast rescue craft, such plan was inadequate. *Id.* at 13. According to Mr. Slater, "the *fact* that it took over an hour and ten minutes to recover the [fast rescue craft] once the engine fails establishes that the plan was inadequate." *Id.* at 14. He points to Captain Iordache's testimony and concludes that "other than the plan to use a lifeboat or supply vessel to assist in the rescue," "there was no actual plan, just some ideas." *Id.* at 14–15. Mr. Slater emphasizes that one of the fast rescue craft crew members explained that "[a] line was thrown . . . from the Harvey Stone crew, and [the fast rescue craft] tied off to them while the crew on the Turritella came up with a rescue plan." *Id.* at 15 (cleaned up). According to Mr. Slater, all of this is damning evidence that the TURRITELLA and its crew were negligent in developing, maintaining, and executing a rescue plan. *See id.*

Based on this record, factual disputes preclude summary judgment on Mr. Slater's claims for negligence. There are material disputes over the actions taken by the TURRITELLA crew in preparing, maintaining, and executing the fast rescue craft venture. While Captain Davis maintains that the precautions were inadequate,

Captain Iordache—an experienced sailor and someone with firsthand knowledge of the incident—maintains that the judgment calls made in the heat of the moment were proper. And the court finds not dispositive Mr. Slater's attempt to point to subsequent remedial measures such as putting extra fuses in the toolbox after the incident. The prudence of the actions taken by the TURRITELLA crew remains in dispute. Accordingly, the court **DENIES** Mr. Slater's motion for summary judgment as to his negligence claims.

### D. Mr. Slater's Claim for Unseaworthiness

"General maritime law imposes a duty upon shipowners to provide a seaworthy vessel." *Hlodan v. Ohio Barge Line, Inc.*, 611 F.2d 71, 74 (5th Cir. 1980). "The doctrine of unseaworthiness is a species of strict liability for injuries resulting from an unsafe condition upon a vessel." *Tex. Menhaden Co. v. Johnson*, 332 F.2d 527, 528 (5th Cir. 1964). "Although the shipowner is not an insurer, his duty is to provide a vessel and equipment reasonably suited for its intended service." *Id.*

"That duty is absolute, and is independent from the duty of reasonable care imposed by the Jones Act." *Hlodan*, 611 F.2d at 74. "This duty to provide a seaworthy vessel requires that the vessel, its gear, appurtenances, and operation must be reasonably safe." *Drachenberg v. Canal Barge Co.*, 571 F.2d 912, 918 (5th Cir. 1978). An appurtenance is "any specifically identifiable item that is destined for use aboard a specifically identifiable vessel and is essential to the vessel's navigation,

operation, or mission." *Anderson v. United States*, 317 F.3d 1235, 1238 (11th Cir. 2003) (cleaned up).

"A vessel's condition of unseaworthiness might arise from any number of circumstances*." Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499 (1971). "Her gear might be defective, her appurtenances in disrepair, her crew unfit." *Id.* But "it is settled law that failure of a piece of equipment under proper and expected use is a sufficient predicate for a finding of unseaworthiness." *Tex. Menhaden*, 332 F.2d at 528.

Mr. Slater maintains that the TURITELLA and the fast rescue craft were unseaworthy. Doc. 69 at 23. According to Mr. Slater, "[t]he [fast rescue craft] was not reasonably fit for its intended use, particularly given its history of recurring engine failure and its failure to be properly equipped with something as simple as a spare fuse." *Id.*

MMSI responds that "[Mr.] Slater appears to say that the unseaworthy craft was the [fast rescue craft] itself, based primarily on its prior engine problems." Doc. 78 at 15. "[B]ut just as [Mr.] Slater relies for this contention on the same evidence as he did for his negligence claim, so also [MMSI] show[s] a dispute of material fact using the same evidence [it] submitted to rebut [Mr.] Slater's earlier argument." *Id.*

MMSI fails to account for the different standards for negligence and unseaworthiness. "What has evolved is a complete divorcement of unseaworthiness

liability from concepts of negligence." *Waldron v. Moore-McCormack Lines, Inc.*, 386 U.S. 724, 726 (1967) (cleaned up). As explained above, unseaworthiness is a "species of strict liability." *Tex. Menhaden*, 332 F.2d at 528. "[T]he exercise of due diligence does not relieve the owner of his obligation to the seaman to furnish adequate appliances." *Mahnich v. S. S.S. Co.*, 321 U.S. 96, 100 (1944). "No matter how much care was used either by the owner, the ship's crew, or the . . . crew member immediately responsible for its maintenance, the failure of the [machinery] under normal expected use visits on the vessel owner an unremitting liability based on the breach of the absolute duty." *Vega v. The Malula*, 291 F.2d 415, 420 (5th Cir. 1961).

The fast rescue craft was launched, and the engine failed. There is no indication anywhere in the record that the engine—or the fast rescue craft—were being used for anything other than their intended purposes. "That is, and has been, . . . a classic case of patent unseaworthiness. The passage of time has but made the warranty of seaworthiness more awesome as it extends to gear used without regard to ownership and to transitory conditions." *Id.* at 419. Even if MMSI's alleged negligence in maintaining the fast rescue craft or developing a rescue plan is heavily disputed, the fact that the engine failed is not. *See* Doc. 78 at 2; Doc. 69 ¶ 6.

But showing a defective condition is not enough. "One of the elements necessary to establish a cause of action for negligence, unseaworthiness, and

products liability is causation." *Nichols v. Barwick*, 792 F.2d 1520, 1522 (11th Cir. 1986). "[T]he burden on the plaintiff to prove proximate cause in actions based on general maritime law and the Jones Act is very light, even featherweight." *Id.* (cleaned up).

The parties do not agree about the nature and extent of Mr. Slater's injuries, and MMSI specifically "does not concede that [Mr.] Slater's current back injuries were caused by the February 22 incident at sea." Doc. 67 at 11 n.6. Rather, MMSI emphasizes that Mr. Slater maintained for several months post-incident that the injury was one to his groin, rather than his back. *See id.* ¶¶ 19–28; Doc. 78 ¶ 19 ("Although [MMSI] do[es] not dispute that [Mr.] Slater reported a *groin* injury at the time of the accident, the nature and extent of his injury is disputed. Slater reported only a groin injury and never reported any kind of back injury to [MMSI].").

Mr. Slater responds that "the nature and extent of [his] injuries are separate and apart from the fact that he suffered *an* injury." Doc. 69 at 15. According to Mr. Slater, "[i]ssues related to the nature and extent of [his] injuries are not the subject of this motion and are reserved for trial." *Id.*

While the parties dispute the nature and extent of Mr. Slater's injuries, the court does not understand MMSI to dispute that Mr. Slater suffered at least a groin injury when the engine failed and he navigated the prevailing seas. *See* Doc. 78 ¶ 19 ("Although Defendants do not dispute that [Mr.] Slater reported a *groin* injury at the

time of the accident . . . .”). That is sufficient to meet Mr. Slater's "featherweight" burden to prove proximate causation, even if the true extent of his injuries is yet to be determined. Accordingly, the court **GRANTS** Mr. Slater's motion for summary judgment on liability as to unseaworthiness, with damages to be proven in further proceedings.

## IV. CONCLUSION

For the foregoing reasons, the court **GRANTS IN PART** and **DENIES IN PART** MMSI's motion and **GRANTS IN PART** and **DENIES IN PART** Mr. Slater's motion.

**DONE** and **ORDERED** this 25th day of March, 2026.

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE